EFiled: Apr 09 2015 03:36PM EDT
Transaction ID 57054784
Case No. 10761-VCN

COURT OF CHANCERY
OF THE
STATE OF DELAWARE

JOHN W. NOBLE
VICE CHANCELLOR

417 SOUTH STATE STREET
DOVER, DELAWARE 19901
TELEPHONE: (302) 739-4397
FACSIMILE: (302) 739-6179

April 9, 2015

Timothy R. Dudderar, Esquire
Aaron R. Sims, Esquire
Potter Anderson & Corroon LLP
1313 North Market Street
Wilmington, DE  19801

Thomas G. Macauley, Esquire
Macauley LLC
300 Delaware Avenue, Suite 760
Wilmington, DE  19801

Re:    *American Messaging Services, LLC v. DocHalo, LLC*
         C.A. No. 10761-VCN
         Date Submitted:  March 30, 2015

Dear Counsel:

Plaintiff American Messaging Services, LLC ("AMS") purchased a 25%

ownership interest in Defendant DocHalo, LLC ("DocHalo") in September 2014.

The companies provide separate but complementary products and services, which

they agreed to cross-sell and bundle to their existing and new customers in the

healthcare industry.[1]  They entered into the Revenue Sharing Agreement, which established the economic terms of their business relationship.[2]

AMS and DocHalo developed and employed a strategic sales and marketing plan.  They agreed that a contract addendum (the "Contract Addendum") would be offered to AMS's customers who decide to purchase DocHalo's services.[3]  The Contract Addendum includes a pricing schedule and provides that fees are payable to AMS.  As of March 14, 2015, four AMS customers had agreed to obtain DocHalo's services and had been presented with a Contract Addendum.[4]

Unfortunately, the parties' relationship quickly soured after DocHalo expressed concerns regarding the revenue share percentages and product pricing. The parties began to discuss unwinding their relationship in January 2015.  On March 4 and 5, 2015, with the parties' future relationship uncertain, AMS learned that a DocHalo executive had contacted some of its sales personnel about joining

---

[1] AMS provides paging services to customers in many industries, including healthcare.  DocHalo supplies an encrypted secure messaging application, which healthcare organizations use to communicate confidential patient information to providers.  Compl. ¶¶ 7-8.

[2] *See* Compl. Ex. D (Revenue Sharing Agmt.).

[3] *See* Compl. Ex. E (Contract Addendum).

[4] Aff. of Jennifer Richardson ("Richardson Aff.") ¶ 26.

DocHalo.  DocHalo had also unilaterally reached out to some of AMS's customers, providing them with Statements of Work that purported to substitute for the billing and payment terms of the Contract Addendum.[5]  The Statements of Work provided that although AMS would invoice customers directly for DocHalo services that were integrated with AMS's, DocHalo would bill for its stand-alone services.

On March 6, 2015, AMS filed its Complaint, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, misappropriation of trade secrets, and tortious interference with contractual relations.  For now, at least, AMS's contract and trade secrets claims substantially overlap; AMS alleges that DocHalo has exploited two lists of AMS customers—the Secure Prospect List and the Medical Account List (together, the "Lists")—which AMS provided to DocHalo to implement the sales and marketing plan.[6]

---

[5] *See* Aff. of Mark Cittadino Ex. 1 (Statement of Work).
[6] *See* Richardson Aff. Ex. 1 (Secure Prospect List); *id.* Ex. 2 (Medical Account List).

The Secure Prospect List contains over 200 hospitals, which have been identified as those most likely interested in DocHalo's offerings.[7] The Medical Account List identifies over 1,000 health care organizations that AMS currently services. It includes hospital names, and for each hospital, its geographic region, number of pager users, and the relevant AMS account manager. AMS alleges that DocHalo has improperly used the Lists to solicit and convert its customers.

On the same day it filed the Complaint, AMS sent to DocHalo a cease and desist letter, which demanded that it stop contacting AMS's customers and soliciting its employees. The parties negotiated a "stand down," whereby DocHalo agreed to comply with the letter until March 16, 2015. During that time, the parties negotiated an unwinding of their business relationship. After that exercise proved fruitless, AMS filed its motion for a temporary restraining order seeking to prevent DocHalo from (i) contacting the customers on the Lists and (ii) contacting AMS's sales personnel. Although AMS initially requested relief for 60 days, it now seeks a 30-day order.

---

[7] The list includes information developed through the parties' sales and marketing efforts.

* * *

A temporary restraining order is intended "to protect the status quo and to prevent imminent and irreparable harm from occurring pending a preliminary injunction hearing or a final resolution of a matter."[8] Three factors guide the Court's consideration: "(i) the existence of a colorable claim, (ii) the irreparable harm that will be suffered if relief is not granted, and (iii) a balancing of hardships favoring the moving party."[9]

While these elements are similar to those considered on a preliminary injunction motion, the Court's analysis has a materially different emphasis.[10] The Court focuses less on the merits of the plaintiff's claims and "primarily upon the injury to plaintiff that is threatened and the possible injury to defendant if the remedy is improvidently granted."[11] Thus, while a colorable claim (accepting the

---

[8] *CBOT Hldgs., Inc. v. Chi. Bd. Options Exch., Inc.*, 2007 WL 2296356, at *3 (Del. Ch. Aug. 3, 2007).
[9] *Id.*
[10] *Cottle v. Carr*, 1988 WL 10415, at *2 (Del. Ch. Feb. 9, 1988).
[11] *Id.*

alleged facts as true) is required, "[t]he essential predicate for issuance of the remedy is a threat of imminent, irreparable injury."[12]

* * *

Establishing a colorable claim is not necessarily a burdensome task and falls short of demonstrating a reasonable probability of success on the merits. Here, AMS has outlined colorable, though not necessarily compelling, claims.

AMS charges DocHalo with: (i) breach of the Revenue Sharing Agreement, (ii) breach of the implied covenant of good faith and fair dealing, and (iii) misappropriation of trade secrets.[13] Two sections of the Revenue Sharing Agreement underlie the breach of contract allegations: Section 7, which protects the confidentiality of information exchanged between the parties, and Section 8, which restricts the parties from soliciting each other's employees.

---

[12] *Id.* at *3.

[13] Although AMS initially asserted that its claim of tortious interference is colorable, it did not respond to DocHalo's argument that DocHalo could not interfere with a contract to which it is a party. That claim, thus, does not appear colorable.

Section 7 of the Revenue Sharing Agreement provides:

> Each party acknowledges that it will receive confidential information during the term of this Agreement including such things as trade secrets, know-how, discoveries, marketing information, business strategies, customer lists, customer information, and other information . . . which may be useful to the receiving party and its Affiliates, and which is not generally available to the public (all of this information is referred to in this Agreement as "Confidential Information" whether or not identified as such on applicable documentation).  Each party agrees that all such Confidential Information will be the sole property of the disclosing party . . . , and the receiving party agrees that it will not disclose any Confidential Information to any other Person . . . and that the receiving party will otherwise keep all Confidential Information in strictest confidence and will not use it for any purpose adverse to the disclosing party and its Affiliates, and will not use Confidential Information for its own benefit or the benefit of others. . . .[14]

AMS alleges that DocHalo has breached (and will further breach) Section 7 by using the Lists to contact AMS customers to negotiate terms by which DocHalo will provide its services.  AMS asserts that this also constitutes trade secret misappropriation.

---

[14] Revenue Sharing Agmt. § 7.

DocHalo's acquisition of the Lists was proper—AMS shared them to facilitate the parties' sales and marketing efforts. However, AMS contends that DocHalo's current use is in a manner never intended by the Revenue Sharing Agreement, *i.e.*, offering its services as replacements for AMS's. Putting to one side AMS's assertion of DocHalo's nefarious intent, nothing in the Revenue Sharing Agreement (assuming it remains effective) appears to prevent DocHalo from negotiating with AMS's customers. In fact, AMS receives a percentage of revenue from DocHalo's stand-alone sales.

On the other hand, the parties entered the Revenue Sharing Agreement "*to work together* to cross sell and bundle each other's products and services . . . ."[15] The parties agreed initially to offer DocHalo's services to AMS's current customers through the Contract Addendum, which would provide consolidated billing. DocHalo's recent actions might conflict with the parties' intent when entering the Revenue Sharing Agreement. There is thus a non-frivolous basis to

---

[15] Revenue Sharing Agmt. third "Whereas" clause (emphasis added).

infer that AMS has colorable claims for either breach of the Revenue Sharing Agreement or breach of the implied covenant of good faith and fair dealing.[16]

AMS has also advanced the notion that DocHalo has repudiated the Revenue Sharing Agreement. Given that repudiation requires a clear and unequivocal statement of intent not to perform contractual duties, the nascent record does not strongly support such a claim.[17] However, AMS does allege that DocHalo has stated that the Revenue Sharing Agreement "does not exist."[18] If the agreement is no longer effective, the argument that DocHalo's current actions are adverse to AMS, and thus violate the Revenue Sharing Agreement, may have more support.

The allegation that DocHalo has breached Section 8 of the Revenue Sharing Agreement by soliciting AMS salespersons also represents a colorable claim. Section 8 prevents the parties

---

[16] Although these claims are colorable, there are problems (as touched upon) associated with them. Also, given that finding a breach of the implied covenant requires inferring contractual terms, granting extraordinary relief solely on the basis of such a claim, while possible, should be somewhat unusual.

[17] *See, e.g.*, *Frontier Oil Corp. v. Holly Corp.*, 2005 WL 1039027, at \*27 (Del. Ch. Apr. 29, 2005) (describing repudiation).

[18] Compl. ¶ 51. This statement appears to contradict other communications and actions by DocHalo.

> during the term of [the Revenue Sharing Agreement] and for a period of one (1) year thereafter . . . [from] knowingly contact[ing] or solicit[ing], either directly or indirectly, any Person connected with the other party or its Affiliates, for the purpose of diverting work or business away from such party or its Affiliates. . . .[19]

DocHalo allegedly solicited AMS's sales personnel to join DocHalo. DocHalo does not vigorously dispute that improper contact might have occurred, but argues that the contact was barely over the line (at most) and will not reoccur.

In sum, there is a colorable claim that DocHalo breached Section 8. It is more difficult to conceive how AMS could show a breach of Section 7; however, that claim is not frivolous.[20]

---

[19] Revenue Sharing Agmt. § 8.

[20] For DocHalo to have breached Section 7, it must have misused AMS's confidential information, as defined in the Revenue Sharing Agreement. For purposes of this motion, that the Lists contain confidential information is a colorable assertion (and one the Court accepts for now). Also, under appropriate circumstances, customer lists may be protected under the Delaware Uniform Trade Secret Act. *See, e.g., Great Am. Opportunities, Inc. v. Cherrydale Fundraising, LLC*, 2010 WL 338219, at * 20 (Del. Ch. Jan. 29, 2010). Given the lenient standard by which the merits of AMS's claims are now reviewed, its trade secret misappropriation claim is colorable.

＊ ＊ ＊

As explicated above, the Court's current focus is on whether AMS faces imminent, irreparable injury absent extraordinary relief. In this regard, AMS has not convinced the Court that it faces dire circumstances. If the Revenue Sharing Agreement is effective, then DocHalo appears to be permitted, or even expected, to contact AMS's customers. AMS contends that DocHalo sent Statements of Work in order to supplant the Contract Addendum and convert AMS's business. However, AMS and DocHalo produce different products and provide different services. Even if AMS's customers eventually migrate toward DocHalo's offerings, that situation does not appear imminent.[21] Further, the Statements of Work explicitly provide that AMS will continue to bill for its services. The statements seem focused on billing terms and it is unclear how they would operate to deprive AMS of its customers.

Additionally, a limited number of Statements of Work were sent, only one was signed, it has since been rescinded, and DocHalo has expressed its intention not to send any more. That AMS has avoided tangible harm to date is not a

---

[21] Nor would such circumstances necessarily be the result of wrongful conduct.

dispositive fact; however, the practical effect of DocHalo's behavior is relevant to the Court's exercise of discretion. Also, the Statements of Work do not appear to breach any explicit terms of the Revenue Sharing Agreement. If anything, they improperly modify the Contract Addendum, which the parties apparently agreed would govern their relationships with AMS customers who add DocHalo's services. It is unlikely that DocHalo needs the Lists to attempt to replace existing Contract Addendum—DocHalo is presumably aware of the customers who have contracted for its services.

To the extent that Statements of Work might be sent to customers who have been provided, but have not yet entered, a Contract Addendum, AMS might possibly suffer some type of harm.[22] However, the nature of the potential harm is amorphous at this time. AMS will continue, per the Revenue Sharing Agreement, to receive a share of revenue from DocHalo's provision of stand-alone services.[23]

---

[22] Again, if the Revenue Sharing Agreement is effective, it is difficult to conceive how DocHalo's conduct breaches Section 7. Sending the Statements of Work does not appear to conflict with any explicit restriction on DocHalo. There is no claim for breach of the Contract Addendum.

[23] Again, on the current record, it appears that the Revenue Sharing Agreement is in effect.

If the Statements of Work impermissibly alter the billing practices or pricing terms of the Contract Addendum, the potential injury to AMS is not of the sort that would justify extraordinary relief.[24]

AMS contends that DocHalo's actions will cause confusion in the marketplace. However, the market is aware of the pending litigation between the parties. If there is already confusion about the status of AMS and DocHalo's relationship, actions that DocHalo might take in the near term would not likely materially alter that fact.

With respect to the issue of employee solicitation, DocHalo's Vice President of Sales, Mark Cittadino ("Mr. Cittadino"), has made communications, suggestive of improper solicitation, to AMS's salespersons. However, AMS has not lost any employee to DocHalo and DocHalo has stated that it has no desire to, and will not, solicit AMS's employees. Mr. Cittadino had routine contact with AMS salespersons, and although he may have made improper communications, the existence of an orchestrated scheme to poach AMS's employees appears unlikely.

---

[24] It is also unclear why DocHalo would need much of the allegedly confidential information contained in the Lists to send the Statements of Work.

DocHalo is thus unlikely to solicit AMS's salespersons at this juncture. Given the record before the Court, the risk that DocHalo will cause imminent, irreparable harm by soliciting AMS's employees is minimal at best.

\* \* \*

When balancing the hardships, the Court must consider the hypothetical harms that each party would suffer if AMS's motion were improvidently decided. As discussed, it is unclear whether AMS faces any imminent harm at all. Assuming it does, such harm is not clearly irreparable.

DocHalo contends that entry of AMS's requested relief would be devastating to its business, effectively shutting it down. This notion is difficult to accept completely; DocHalo could continue to provide services to customers within the terms of its existing contracts and within the terms of the Contract Addendum. Also, a temporary restraining order is of short duration. However, the Secure Prospect List and, especially, the Medical Contact List, cover a broad range of customers. DocHalo could be prevented from contact with thousands of hospitals, perhaps more than half of those in the United States. That could certainly be problematic for a company focused on the healthcare industry.

There is also the possibility that preventing DocHalo from contacting medical providers could adversely affect patient care. Medical personnel use DocHalo's services to exchange information, and communications might be disrupted if DocHalo were restricted by a court order. While the Court has not carefully considered the likelihood or scope of this potential problem, it is a concern that only arises if AMS's motion is granted.

From the record before the Court, the harm facing DocHalo if it were unjustly enjoined is larger than the injury that AMS might face in the absence of temporary relief. The balance of the hardships thus tilts in favor of denying AMS's motion.

\* \* \*

AMS has established colorable, though not yet compelling, claims against DocHalo. However, AMS does not appear to face imminent and irreparable harm that would justify extraordinary relief. It is not clear that the probability of injury absent a temporary restraining order is more than minimal. Balancing the hardships also suggests denying AMS's motion. After weighing these factors, AMS's motion for a temporary restraining order is denied.

**IT IS SO ORDERED.**

Very truly yours,

*/s/ John W. Noble*

JWN/cap
cc:    Register in Chancery-K